GILLHAUS BEVERAGE COMPANY, INC., T/A FAVIN IMPORTERS & JAMES SLEIGH, LTD., *ET AL.*, PLAINTIFFS, v. JOSEPH H. LERNER, DIVISION OF ALCOHOLIC BEVERAGE CONTROL, *ET AL.*, DEFENDANTS.

IRVING HEIR, INDIVIDUALLY AND ON BEHALF OF A CLASS, PLAINTIFF-APPELLANT, v. JOSEPH H. LERNER, DIRECTOR, DIVISION OF ALCOHOLIC BEVERAGE CONTROL, *ET AL.*, DEFENDANTS-RESPONDENTS.

JOHN J. GARRITY *ET AL.*, PLAINTIFFS, v. JOSEPH H. LERNER, DIRECTOR, DIVISION OF ALCOHOLIC BEVERAGE CONTROL, *ET AL.*, DEFENDANTS.

Argued October 16, 1978—Decided January 11, 1979.

501

502

*Messrs. Harold H. Fisher* and *John Zen Jackson* argued the cause for appellant (*Messrs. Shanley & Fisher,* attorneys).

*Messrs. Alan Dexter Bowman* and *Carl A. Wyhopen,* Deputy Attorneys General, argued the cause for respondents (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

SULLIVAN, J. The appeal herein, taken as of right, by plaintiffs, involves a class action filed by Irving Heir, the holder of a solicitor's permit issued by the New Jersey Division of Alcoholic Beverage Control (Division). Plaintiff

504

represents a class consisting of the members of the Wine and Liquor Salesmen of New Jersey Local 19, later expanded to include all licensed solicitors whether or not they were members of the union.[1] The complaint challenges the legality of an investigation being conducted by the Director of the Division into certain alleged illegal practices in the liquor business in this State. Specifically, the challenge is directed to a questionnaire and letter distributed by the Director to all licensed solicitors in the wholesale liquor industry.

The investigation stems from a federal Securities and Exchange Commission proceeding in the spring of 1976 which disclosed the existence of kickbacks and commercial bribery in the liquor business throughout the nation, including New Jersey. As a result of these disclosures, the Director of the Division began an investigation of the wholesale liquor industry in order to ascertain the nature and extent of unlawful trade practices in this State. As part of his investigation, the Director, on February 23, 1977, sent questionnaires to all licensees and solicitors in the wholesale liquor, wine and beer industry seeking sworn answers to inquiries about a variety of trade practices. The questionnaires were to be returned no later than March 21, 1977.

In a covering letter the Director urged cooperation with the investigation and added that a failure to return the completed questionnaire or to provide "complete and accurate answers to all questions" might subject "your license or permit to suspension or revocation." The Director also warned:

I realize that, if you answer all of the questions truthfully and forthrightly, you may be revealing unlawful activity in which you were engaged. In disciplinary proceedings which may result, your admission, and cooperation with respect thereto, will be a mitigating factor, which will be taken into consideration in the imposition of penalty.

---

[1]Defendants named are the Director of the Division, the Division and the Attorney General of the State of New Jersey.

However, with respect to violations committed by you which the Division prosecutes based upon its own information, or through information supplied by others, particularly where you have withheld information, or have given false and misleading information in your answers to the questionnaire, they will be dealt with accordingly.

Copies of the questionnaire and covering letter sent to Heir and all other licensed salesmen and solicitors, are appended to this opinion.

The questionnaires sent to wine and liquor wholesalers, and malt beverage wholesalers, were also challenged in separate suits. The *Gillhaus* suit was filed on behalf of wine and liquor wholesalers. The *Garrity* suit was brought on behalf of the malt beverage wholesalers. All three suits, *Heir, Gillhaus* and *Garrity,* were consolidated before the trial judge who issued temporary restraints against enforcement of the questionnaires pending resolution of the litigation.

On cross-motions for summary judgment, the trial judge ruled in favor of defendants and entered judgment dismissing the complaints and vacating the temporary restraints. He held (1) that use of a questionnaire was within the statutory authority of the Director in conducting an investigaion into possible violations of the Alcoholic Beverage Law; (2) that the questionnaire in and of itself did not represent a violation of any notion of fair play or due process; (3) that plaintiffs fifth amendment claims were being raised prematurely. Plaintiffs in all three suits filed appeals with the Appellate Division.

After the trial court dismissed the complaints and vacated the restraints, the Director sent a second letter to licensees setting another deadline of August 15, 1977 for answering the questionnaire. The letter further stated:

In order to insure that there is no misunderstanding regarding the questionnaire, you are asked to complete and return the questionnaire by August 15, 1977, under your statutory obligation to facilitate a Division investigation. Rule 35 of State Regulation 20, *N. J. S. A.* 33:1–35. If you feel that you may claim a privilege in answer

to a particular question asked, you may respond to that specific
question by asserting the privilege which you claim. In determining
whether or not you have failed to facilitate or hindered the investiga-
tion on the basis of your answers to the questionnaire, a claim of
privilege to a specific question will be considered an appropriate
response.

This new deadline was stayed by the Appellate Division
pending appeal which was heard on an accelerated basis.
Following argument, the Appellate Division, in an unreported
*per curiam* opinion, affirmed the dismissal of the *Heir* and
*Gillhaus* complaints essentially for the reasons expressed by
the trial judge. As to the *Garrity* suit, the Appellate Division
reversed the dismissal of the complaint and remanded to
the Director of the Division with direction to give further
consideration to the questionnaire as it related to the malt
beverage industry. It noted that the industry activities
under scrutiny were not unlawful in the case of malt
beverages and that it might be unreasonably burdensome to
require malt beverage wholesalers to answer all of the
questions in the absence of a demonstrable need.

The *Garrity* ruling by the Appellate Division has not been
appealed. Likewise, the *Gillhaus* plaintiffs have not appealed
the Appellate Division affirmance of the dismissal of their
complaint. The sole matter before us is the *Heir* complaint,
plaintiffs therein having filed an appeal as of right. *R.* 2:2–1
(a)(1).

Plaintiffs' basic contention is that the questionnaire and
covering letter are violative of fifth amendment rights in
that the Division seeks to compel licensees to disclose pos-
sible illegal and incriminating activities under the threat
of sanctions and recriminations if they fail to comply. They
are critical of the trial and appellate rulings which did not
consider the merits of plaintiffs' fifth amendment claims,
but merely held that they had been raised prematurely.

Plaintiffs also challenge the technique of investigation by
the use of questionnaires as *ultra vires*, unreasonable and
violative of due process. Finally, they argue that the

questionnaire violates their right of privacy and also that since they are a suspect class by virtue of an investigation into criminal activities, they are entitled to declaratory and injunctive relief that they need not answer the questionnaire.

The Alcoholic Beverage Control Act, *N. J. S. A.* 33:1–1 *et seq.*, vests the Director with extensive regulatory and investigative power over the liquor industry. The language of Section 35 authorizing the Director to investigate activities involving intoxicating beverage is broad in its sweep:

> The Director of the Division of Alcoholic Beverage Control and each other issuing authority may make, or cause to be made, such investigations as he or it shall deem proper in the administration of this chapter and of any and all other laws now or which may hereafter be in force and effect concerning alcoholic beverages, or the manufacture, distribution or sale thereof * * *.
>
> *N. J. S. A.* 33:1–35.

The Legislature has also imposed strict requirements upon licensees:

> Every applicant for a license, and every licensee, and every director, officer, agent and employee of every licensee, shall, on demand, exhibit to the director * * * all of the matters and things which the director of the division * * * is hereby authorized or empowered to investigate, inspect or examine, and to facilitate, as far as may be in their power so to do, in any such investigation, examination or inspection, and they shall not in any way hinder or delay or cause the hindrance or delay of same, in any manner whatsoever.
>
> *Id.*

The Director is empowered in conducting the investigation to

> examine, under oath, any and all persons whatsoever and compel by subpoena the attendance of witnesses and the production of books, records, accounts, papers and documents of any person or persons and the director * * * may take any oath or affirmation of any person to any deposition, statement, report or application required in the administration of this chapter * * *.
>
> *Id.*

To insure, however, that the expansive reach of the Director's authority would not be indirectly circumscribed by the express listing of his powers, the statute further provides:

> The above enumerations of purposes and powers shall not be construed as exclusive and shall not limit such power to investigate, examine and subpoena for any purpose consonant with the administration and enforcement of this chapter.

*Id.*

Moreover, the Legislature has mandated that the chapter is to be liberally construed in order to effectuate the objective of remedying the "abuses inherent in liquor traffic." *N. J. S. A.* 33 :1–73.

■■ While Section 35 does not specifically refer to the use of questionnaires, we conclude that the use of this investigative tool is well within the statutory authority granted to the Director. The Director's statutory authority to use a questionnaire as an investigative tool can only be adequately considered in light of the broad regulatory power exercised by the State over the liquor industry. Under the twenty-first amendment to the federal constitution the states are granted extensive regulatory power. See *California v. La Rue,* 409 *U. S.* 109, 115, 93 *S. Ct.* 390, 34 *L. Ed.* 2d. 342, 350 (1972) ; *Seagram & Sons v. Hostetter,* 384 *U. S.* 35, 41–42, 86 *S. Ct.* 1254, 16 *L. Ed.* 2d 336, 342 (1966). In *Blanck v. Mayor and Borough Council of Magnolia,* 38 *N. J.* 484, 490 (1962), this Court described the police power of the State as "practically limitless" in this area. See *Borough of Fanwood v. Rocco,* 33 *N. J.* 404, 411 (1960).

■ The abuses inherent in the trade and the need for effective and comprehensive measures for controlling the attendant evils have been recognized in many decisions. See *e.g., Colonnade Catering Corp. v. United States,* 397 *U. S.* 72, 76–77, 90 *S. Ct.* 774, 25 *L. Ed.* 2d 60, 64–65 (1970) ; *Grand Union Co. v. Sills,* 43 *N. J.* 390, 398 (1964) ; *Butler Oak Tavern v. Division of Alcoholic Beverage Control,* 20 *N. J.* 373, 384 (1956) ; *X–L Liquors, Inc. v. Taylor,* 17

*N. J.* 444, 449 (1955); *Kasser Distillers Product Corp. v. Sills,* 85 *N. J. Super.* 351, 355 (Ch. Div. 1964). The State may prohibit the trade entirely or permit it to continue only under severe restrictions. See *Grand Union Co. v. Sills, supra,* 43 *N. J.* at 398. As noted earlier, the statute authorizes a broad power; the right to fully and completely investigate possible illegalities through any lawful and reasonable means is permitted under *N. J. S. A.* 33:1–35.

The purpose of the instant investigation is to ascertain the nature and extent of certain unlawful trade practices in the liquor industry in New Jersey. In view of the number of licensees therein, use of a questionnaire addressed to all licensees is a practical way of proceeding with the investigation.

Of course it is axiomatic that the State, in exercising its plenary power to regulate the liquor industry, cannot trespass on a licensee's constitutional rights. *Craig v. Boren,* 429 *U. S.* 190, 206, 97 *S. Ct.* 451, 50 *L. Ed.* 2d 397, 412 (1976). Due process is a basic requirement in the regulatory scheme. Fifth amendment rights must be given full protection. On this score, it can be said that plaintiffs' fifth amendment claims are technically premature in the sense that no claims of privilege have been asserted in response to the questions contained in the questionnaire, nor have sanctions been imposed. See *N. J. Builders, Owners and Managers Association v. Blair,* 60 *N. J.* 330, 340 (1972). Nevertheless, the letter accompanying the questionnaire improperly sought to have licensees waive their fifth amendment rights by stating that failure to provide complete and accurate answers "to all questions" might subject "your license or permit to suspension or revocation." It continued that if the licensee answered all the questions, and in doing so revealed unlawful activity, "your admission and cooperation thereto will be a mitigating factor which will be taken into consideration in the imposition of penalty." The letter added that with respect to violations committed by the licensees which the Division learns about from other sources,

"particularly where you have withheld information, * * * they will be dealt with accordingly."

This was improper, no matter how well-intentioned the Division may have been. The portions of the letter referred to above, had a chilling effect on a licensee's fifth amendment rights. If the answer to certain questions required a licensee to admit unlawful activity on his part, he had the right to assert the privilege without subjecting himself to a threat of sanctions for so doing. *Lefkowitz v. Turley,* 414 *U. S.* 70, 75, 94 *S. Ct.* 316, 38 *L. Ed.* 2d 274, 281 (1973); *Spevack v. Klein,* 385 *U. S.* 511, 514–515, 87 *S. Ct.* 625, 17 *L. Ed.* 2d 574, 577 (1967).

The portions of the letter which thus intruded on plaintiffs' fifth amendment rights were improper and unenforceable. The Director's subsequent letter of July 18, 1977, stating that a claim of privilege to a specific question "will be considered an appropriate response," was inadequate to erase the harm contained in the original communication. Accordingly, the judgment of the Appellate Division upholding the questionnaire must be modified so as to strike down as illegal the offending parts of the covering letter.

This does not mean that a licensee is free to claim privilege to any and all questions propounded in the questionnaire. The claim must be asserted in good faith and some basis therefor must exist. The Division would always have the right to seek judicial review of the validity of a claim of privilege. *N. J. S. A.* 33:1–35. It also is free to pursue other means of investigation and examination, as authorized by law. *Id.*

Use of the questionnaire as an investigative tool does not violate due process, intrude on plaintiffs' constitutional rights of privacy or constitute a "fishing expedition" without any lawful, defined purpose.

The controlling standard for an administrative investigation was announced in *United States v. Morton Salt Co.,* 338 *U. S.* 632, 653, 70 *S. Ct.* 357, 369, 94 *L. Ed.* 401, 416 (1950):

\* \* \* [I]t is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. "The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable." *Oklahoma Press Publishing Co. v. Walling,* 327 *U. S.* 186, 208, 66 *S. Ct.* 494, 90 *L. Ed.* 614, 629.

Plaintiffs as licensees under the act are subject to the control of the Director in his supervision of the liquor industry. Among the powers vested in the Director is the right to make such investigations as he shall deem proper in the administration of all alcoholic beverage laws. Licensees are required to cooperate in such investigations.

Plaintiffs seem to concede that the Director has the power to subpoena them and examine them under oath as to the same matters contained in the questionnaire, subject to their right to claim privilege. We do not see how conducting the same examination by questionnaire makes the inquiry illegal. The purpose of the investigation is clear. As stated in the covering letter, its focus is the existence of price discrimination by wholesalers among retailers, and the giving of rebates, kickbacks, unlawful discounts, allowances or other inducements by wholesalers to retailers. The questions are directed to the matters under investigation. Subject to a legitimate claim of privilege, plaintiffs have a statutory obligation as licensees to answer pertinent questions regarding their activities as licensees.

The contention that the investigation makes plaintiffs a "highly suspect group," giving rise to a constitutional privilege not to respond at all to the questionnaire lacks merit. It is true, as plaintiffs assert, that an individual may be privileged from responding to a governmental inquiry initially, and may invoke the privilege against self-incrimination as a defense in an enforcement action against him for failure to respond to the government's demand. The privilege may be asserted against an inquiry in an area permeated with criminal statutes, where any response might involve the individual in the admission of a crime, and

where the inquiry is directed not to the public at large, but to a select group highly suspect of illegal activity. See *Marchetti v. United States,* 390 *U. S.* 39, 47, 88 *S. Ct.* 697, 19 *L. Ed.* 2d 889, 897 (1968) ; *Grosso v. United States,* 390 *U. S.* 62, 64–69, 88 *S. Ct.* 709, 19 *L. Ed.* 2d 906, 909–913 (1968) ; *Haynes v. United States,* 390 *U. S.* 85, 98–99, 88 *S. Ct.* 722, 19 *L. Ed.* 2d 923, 933 (1968) ; *Albertson v. S. A. C. Board,* 382 *U. S.* 70, 79, 86 *S. Ct.* 194, 15 *L. Ed.* 2d 165, 172 (1965). The instant investigation does not fall within the ambit of these cases since plaintiffs are licensees in a highly regulated industry and the inquiry is limited to their activities as licensees. Nor has any action been commenced for failure to respond to the demand. Answering the questionnaire need not implicate an individual in criminal activity since the assertion of the fifth amendment privilege will be considered "an appropriate response" to any question. That privilege, however, does not confer immunity from investigation in these circumstances.

It is now more than a year and a half since the Director began this investigation into alleged abuses and illegal activities in the wholesale liquor industry in this State. Subject to the limitations heretofore indicated, he must be allowed to carry out his statutory obligation. His use of the questionnaire as an investigative tool is hereby upheld subject to plaintiffs' assertion of fifth amendment rights.

As noted, the original covering letter improperly compromised those rights. While the follow-up letter attempted to ameliorate the earlier threat implicating the fifth amendment concerns of plaintiffs, it behooves the Director to eliminate any lingering fears on this score. The questionnaire itself is a legitimate administrative, investigatory tool. As such, it does not intrude on plaintiffs' constitutional right of privacy since it is directed towards their regulated activities as licensees under the Alcoholic Beverage Control Act. If the Director is to pursue this investigation, we assume that he will do so in good faith in a manner consistent with this opinion. This should entail the explicit withdrawal of

the original transmittal letter and the resubmission of the questionnaire, together with a clear expression by the Director that plaintiffs' fifth amendment rights will be respected.

The judgment of the Appellate Division is modified accordingly and, as modified, is hereby affirmed.

## APPENDIX

State of New Jersey
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF ALCOHOLIC BEVERAGE CONTROL
26 COMMERCE DRIVE, CRANFORD, N. J. 07013 (201) 272-8511

WILLIAM F. HYLAND
ATTORNEY GENERAL

JOSEPH H. LERNER
DIRECTOR

TO LICENSEE OR PERMITTEE:

As you are undoubtedly aware, the Division of Alcoholic Beverage Control is presently engaged in a thorough and impartial investigation of the wholesale liquor industry within the State of New Jersey.

The focus of this investigation is the existence of price discrimination by wholesalers among retailers, and the giving of rebates, kickbacks. unlawful discounts, allowances or other inducements by wholesalers to retailers, all of which activity are prohibited, except as to malt beverages.

In order to further assure the integrity of the alcoholic beverage industry, and for the public good, I am now enlisting your cooperation, and am calling upon *you* directly to assist the Division in the investigation. The Division seeks to accurately ascertain the nature and extent of these unlawful trade practices in New Jersey, some of which have recently been brought to light on a national level by various news media.

Enclosed is a questionnaire which you are to complete according to the instructions contained in it. You are to return the completed questionnaire to the address specified by Monday, March 21, 1977.

If you fail or refuse to return the completed questionnaire, or to provide complete and accurate answers to all questions therein, you may be charged with failing to facilitate or hindering a Division investigation, thereby subjecting your license or permit to suspension or revocation. *Rule* 35 of State Regulation No. 20. *N. J. S. A.* 33:1-35.

If you are of the view that any of the information sought is privileged, then you may decline to respond to the specific question in issue. In this event, you must notify the Division, in writing, of the specific claim within ten days of the receipt of this questionnaire.

I realize that, if you answer all of the questions truthfully and forthrightly, you may be revealing unlawful activity in which you were engaged. In disciplinary proceedings which may result, your admission, and cooperation with respect thereto, will be a mitigating factor, which will be taken into consideration in the imposition of penalty.

However, with respect to violations committed by you which the Division prosecutes based upon its own information, or through information supplied by others, particularly where you have withheld information, or have given false or misleading information in your answers to the questionnaire, they will be dealt with accordingly.

Since unlawful trade practices undermine respect for the law, and adversely affect the stability of the liquor industry in which you make your livelihood, I urge you to volunteer any information concerning illicit practices in any phase of the alcoholic beverage industry.

s/ Joseph H. Lerner
Director

STATE OF NEW JERSEY
Department of Law and Public Safety
DIVISION OF ALCOHOLIC BEVERAGE CONTROL
25 Commerce Drive, Cranford, N. J. 07016

*INSTRUCTIONS PLEASE*: (1) READ ALL QUESTIONS COMPLETELY FIRST. (2) PRINT CLEARLY OR TYPE ANSWERS TO ALL QUESTIONS. (3) SIGN THE QUESTIONNAIRE BEFORE A NOTARY PUBLIC UNDER OATH OR BRING IT TO THE DIVISION OF ALCOHOLIC BEVERAGE CONTROL AT THE ABOVE ADDRESS AND AN OATH WILL BE ADMINISTERED PURSUANT TO N. J. S. A. 33:1–35. (4) MAIL THE QUESTIONNAIRE TO THE ABOVE ADDRESS.

*NOTE:* IF RIDERS OR OTHER ATTACH-
MENTS ARE USED DATE AND SIGN THE
SAME IN FRONT OF THE PERSON ADMIN-
ISTERING THE OATH AS REQUIRED BE-
LOW.
PURSUANT TO N. J. S. A. 33 :1–1 *et seq.* THE
UNDERSIGNED CERTIFIES TO THE COR-
RECTNESS OF THE FOLLOWING INFOR-
MATION:

(1) SOLICITOR PERMIT NO. .........................
NAME ...............................................
BUSINESS ADDRESS ...............................
PRESENT EMPLOYER .............................
HOME ADDRESS ..................................

(2) HOW LONG HAVE YOU POSSESSED A SOLICI-
TOR'S PERMIT ISSUED BY THE DIRECTOR
OF THE DIVISION OF ALCOHOLIC BEVERAGE
CONTROL? ...................................

(3) BY WHOM WERE YOU EMPLOYED AS A SO-
LICITOR SINCE JANUARY 1, 1974 AND WHAT
WERE YOUR BASE SALARY AND COMMIS-
SIONS FOR THOSE PERIODS?

| YEAR | EMPLOYER | BASE SALARY | COMMISSIONS |
|------|----------|-------------|-------------|
| 1974 | ........ | ........... | ........... |
| 1975 | ........ | ........... | ........... |
| 1976 | ........ | ........... | ........... |
| 1977 to date | ........ | ........... | ........... |

(4) ARE YOU A MEMBER OF THE LIQUOR
SALESMEN'S UNION? .........................

(5) HAVE YOU EVER SINCE JANUARY 1, 1974,
DIRECTLY OR INDIRECTLY, ARRANGED FOR,
TRANSFERRED, OR BEEN A PARTY TO; THE
PAYING OF CASH REBATES, GIVING OF "UN-
POSTED" DISCOUNTS, GIVING OF FREE
GOODS, EXTRA MERCHANDISE OR SERVICES
OR OTHER ALLOWANCES OR INDUCEMENTS
TO CLUBS OR RETAILERS OF MALT OR ALCO-

HOLIC BEVERAGES IN THE STATE OF NEW JERSEY; INCLUDING BUT NOT LIMITED TO: LOANS OF MONEY OR GOODS, EXTENSION OF CREDIT BEYOND 30 DAYS, PROVIDING MALT OR ALCOHOLIC BEVERAGES TO CLUBS OR RETAILERS ON THE "DEFAULT LIST" WITHOUT IMMEDIATE CASH PAYMENT, OR PROVIDING MALT OR ALCOHOLIC BEVERAGES TO CLUBS OR RETAILERS ON THE "NON-DELIVERY" LIST? .............................
EXPLAIN AND IDENTIFY IN DETAIL THE TIME, PLACE, NAME OF THE WHOLESALE HOUSE, NAME OF THE CLUB OR RETAILER, AND NATURE OF THE TRANSACTION .. ....

(6) SINCE JANUARY 1, 1974 HAS ANY DISCIPLINARY ACTION IN ANY FORM EVER BEEN TAKEN AGAINST YOU BY YOUR EMPLOYER(s) FOR CONDUCT IDENTIFIED IN QUESTION (5) ABOVE? ....................
EXPLAIN IN DETAIL .......................

(7) DOES YOUR EMPLOYER IN ANY WAY PROVIDE FOR THE REIMBURSEMENT TO RETAILERS OR CLUBS FOR BROKEN CONTAINERS OF MALT OR ALCOHOLIC BEVERAGES?

EXPLAIN IN DETAIL ...........................

(8) DOES YOUR EMPLOYER IN ANY WAY PRO-
VIDE FOR THE REIMBURSEMENT OF TRAVEL
OR ANY OTHER EXPENSES INCURRED BY
YOU? ...................................
EXPLAIN IN DETAIL ...................

..............................................

..............................................

..............................................

(9) DO YOU HAVE ANY INFORMATION ABOUT
ANY RETAILER, CLUB, WHOLESALER, SALES
REPRESENTATIVE, MISSIONARY MAN, OF-
FICER OR DIRECTOR OR EMPLOYEE OF ANY
COMPANY LICENSED TO OR DOING BUSI-
NESS IN THE ALCOHOLIC BEVERAGE IN-
DUSTRY IN THIS STATE, CONCERNING THE
TYPES OF CONDUCT IDENTIFIED IN QUES-
TION NO. (5) (ABOVE) SINCE JANUARY 1,
1974? ...................................
EXPLAIN IN DETAIL AS ABOVE ..........

..............................................

..............................................

..............................................

(10) SINCE JANUARY 1, 1974, HAVE YOU, OR HAS
YOUR EMPLOYER REQUIRED YOU, TO KEEP
OR PLACE ANY PORTION OF YOUR SALARY,
COMMISSIONS, OR REIMBURSEMENTS IN
ANY PUBLIC, PRIVATE, OR COMPANY AC-
COUNT, CLUB OR FUND WHATSOEVER? ....

..............................................

EXPLAIN IN DETAIL THE NATURE AND PUR-
POSE OF SUCH ACCOUNT, CLUB OR FUND:
WHERE IT IS MAINTAINED AND BY WHOM:
AND THE NATURE AND EXTENT OF ANY
TERMS RESTRICTING YOUR WITHDRAWAL

OF THE ENTIRE AMOUNT ON DEPOSIT UPON
YOUR DEMAND. ...............................
.............................................
.............................................
.............................................
.............................................

STATE OF        )
                )  ss
COUNTY OF       )
.................... BEING DULY SWORN AC-
(Name of Affiant)
CORDING TO UPON HIS OATH, DEPOSES AND
SAYS THAT THE ANSWERS, STATEMENTS
AND DECLARATIONS MADE IN THE FORE-
GOING ARE ABSOLUTELY TRUE IN ALL RE-
SPECTS.
SWORN TO AND SUBSCRIBED BEFORE
ME THIS
............ DAY OF ..........., 19 ......
... ............................. ........
(Signature of Officer Administering Oath)
                        (Signature of Affiant)
...............................  .....
(Title of Such Officer)

PASHMAN, J., concurring and dissenting. I concur in the
majority's conclusion that the Director's threat to impose
sanctions upon those who choose to invoke the privilege
against self-incrimination amounts to an unconstitutional
attempt to coerce a waiver of that privilege. It is therefore
clear that the Director may not, in any way, seek to carry
out that threat. However, I cannot accept the majority's
holding that no constitutional infirmity is present in the
requirement that plaintiffs respond to the questionnaire and
invoke their privilege only with respect to particular ques-
tions. Inasmuch as the questionnaire has been distributed
to a finite and well-defined group of individuals suspected

of criminal activity, a licensee's claim of privilege as to a particular question will, for all intents and purposes, single him out as the perpetrator of an offense, and lead the Director to focus his investigation upon that individual's past conduct. Such a state of affairs will therefore impermissibly "oblig[e] [a licensee] 'to [spotlight his] guilt [in order] to avoid admitting it.'" *Marchetti v. United States,* 390 *U. S.* 39, 50, 88 *S. Ct.* 697, 704, 19 *L. Ed.* 2d 889 (1968). Consequently, I am of the view that plaintiffs have a constitutional right to refrain from responding to these questions in any manner whatsoever.

## I

### *Ripeness*

Although individual members of the plaintiff class have not as of yet invoked the right not to respond to particular questions, the issues herein posed are ripe for judicial resolution. At the present juncture, plaintiffs are faced with the Hobson's choice of either answering the questions and thereby waiving any valid claims of privilege they may possess, or refusing to respond and risking the imposition of sanctions should a court later determine that their privilege claims lack merit. Plaintiffs are thus placed in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate. *See, e. g., Abbott Laboratories v. Gardner,* 387 *U. S.* 136, 152, 87 *S. Ct.* 1507, 18 *L. Ed.* 2d 681 (1967).

Moreover, delay in resolution of plaintiffs' claims would run counter to the policies underlying the constitutional prohibition of compelled self-incrimination. The uncertainty existing with respect to the applicability of the privilege in this case, if not presently resolved, undoubtedly will chill the assertion of potentially valid claims of privilege. To therefore require plaintiffs to refuse to respond in order to have their claims adjudicated "is, in effect, to contend that they should be denied the protection of . . . [a constitutional] privilege intended to relieve [them] of the necessity of

making a choice between incriminating themselves and risking serious punishments for refusing to do so." *Albertson v. Subversive Activities Control Board, 382 U. S. 70, 76, 86 S. Ct. 194, 197, 15 L. Ed. 2d 165* (1965).

The issue herein tendered is purely legal in nature: whether plaintiffs can be constitutionally compelled to respond to the questionnaire. Delay will therefore not result in the unearthing of facts which will make resolution an easier task. Moreover, there is no question that a real dispute exists between the parties and that this dispute will not be mooted by the future course of events. Hence, the matter should be resolved at the present time. *See, e. g., Abbott Laboratories, supra,* 387 *U. S.* at 149, 87 *S. Ct.* 1507; *Albertson, supra,* 382 *U. S.* at 75–76, 86 *S. Ct.* 194.[1]

These same considerations support the conclusion that plaintiffs' claims of undue coercion are ripe for judicial resolution. If plaintiffs invoke the privilege, they run the risk that the Director will be able to carry out his threats and revoke their licenses. If through fear of sanctions they forego their right not to incriminate themselves and a

---

[1] The Supreme Court's decision in *California Bankers Ass'n v. Shultz,* 416 *U. S.* 21, 94 *S. Ct.* 1494, 39 *L. Ed.* 2d 812 (1974), does not require — nor even suggest — a contrary result. In *Shultz* the Justices held premature claims by bank depositors that certain reporting requirements of the Bank Secrecy Act of 1970 were violative of the privilege against compelled self-incrimination. Title II of the Act mandated, *inter alia,* that any depositor engaging in specified foreign or domestic monetary transactions disclose the nature of those transactions to the government. In dismissing the depositors' Fifth Amendment claims on prematurity grounds, the Justices emphasized that no plaintiff had alleged either (1) that the information required to be disclosed would tend to be incriminating or (2) that he had engaged in or intended to engage in any transactions subject to the reporting requirement.

In the present case, however, neither of these factors is present. Plaintiffs have alleged that the questions seek to elicit self-incriminatory responses. More importantly, the disclosures deal with past acts which have already occurred — not future acts which might or might not transpire.

court later determines that the Director's threats were *ultra vires,* plaintiffs will have been coerced into relinquishing their constitutional rights. The Director's actions are thus exerting a present chilling effect upon plaintiffs' assertion of the privilege. The legality of those actions should therefore be determined at the present time.

## II

### Applicability of Privilege
### Against Compelled Self-Incrimination

The privilege against compelled self-incrimination is the mainstay of our accusatorial system of criminal justice and, as such, is applicable to states through the due process clause of the Fourteenth Amendment. *Malloy v. Hogan,* 378 *U. S.* 1, 84 *S. Ct.* 1489, 12 *L. Ed.* 2d 653 (1964). Moreover, this privilege — although not written into the New Jersey Constitution — is firmly established as a part of our common law and has been incorporated into our Rules of Evidence. *See Evid R.* 23, 24 and 25; *In re Ippolito,* 75 *N. J.* 435, 440 (1978); *State v. Vinegra,* 73 *N. J.* 484, 488–489 (1977). Consequently, whenever a court "is confronted with the question of a compelled disclosure that has an incriminating potential [,] the judicial scrutiny [must be] a close one." *California v. Byers,* 402 *U. S.* 424, 427, 91 *S. Ct.* 1535, 1537, 29 *L. Ed.* 2d 9 (1971).

The situations in which the privilege can be invoked are broad in scope. An individual is not merely protected from being involuntarily called as a witness against himself in a criminal prosecution. He is also privileged not to answer official questions put to him in any other context, civil or criminal, formal or informal, where the answers might incriminate him in future proceedings. *Lefkowitz v. Turley,* 414 *U. S.* 70, 77, 94 *S. Ct.* 316, 38 *L. Ed.* 2d 274 (1973). Moreover, it matters not whether the self-incriminatory admissions are sought to be obtained through oral testimony or written responses. *See, e. g., Marchetti v. United States,*

*supra; Albertson v. Subversive Activities Control Board, supra,* 382 *U. S.* at 78, 86 *S. Ct.* 194. In either situation, the privilege can be invoked.

Thus, for example, the privilege is applicable to testimony given during grand jury proceedings, *see, e. g., In re Tuso,* 73 *N. J.* 575 (1977) ; information requested during hearings before state investigative committees, *see, e. g., In re Ippolito,* 75 *N. J.* 435 (1978) ; and admissions sought during official inquiries into the qualifications of licensed professionals, *see e. g., Lefkowitz v. Turley,* 414 *U. S.* 70, 78, 94 *S. Ct.* 316, 38 *L. Ed.* 2d 274 (1973). Most importantly for present purposes, the privilege may be invoked with respect to information sought to be elicited through forms and questionnaires prepared by government agencies. *See, e. g., Marchetti v. United States, supra* (IRS) ; *Grosso v. United States,* 390 *U. S.* 62, 88 *S. Ct.* 709, 19 *L. Ed.* 2d 906 (1968) (IRS) ; *Haynes v. United States,* 390 *U. S.* 85, 88 *S. Ct.* 722, 19 *L. Ed.* 2d 923 (1968) (Treasury Department) ; *Albertson v. Subversive Activities Control Board, supra* (SACB). There is thus no doubt that the privilege is applicable in the present context.

## III

### Attempt to Coerce a
### Waiver of the Privilege

It is well settled that an agent of the State cannot pursue a course of action whose object is to penalize an individual's assertion of his constitutional rights. *See, e. g., Bordenkircher v. Hayes,* 434 *U. S.* 357, 362, 98 *S. Ct.* 663, 667, 54 *L. Ed.* 2d 604, 610 (1978). Consequently, a state agency may neither impose nor threaten to impose sanctions upon a person because he elects to exercise his right not to tender self-incriminatory testimony. *Lefkowitz v. Cunningham,* 431 *U. S.* 801, 806, 97 *S. Ct.* 2132, 53 *L. Ed.* 2d 1 (1977) ; *Lefkowitz v. Turley, supra,* 414 *U. S.* at 81–82, 94 *S. Ct.* 316; *Garrity v. New Jersey,* 385 *U. S.* 493, 500, 87 *S. Ct.* 616, 17

*L. Ed.* 2d 562 (1967). The State is not merely precluded from punishing criminally one who asserts the privilege. Since "the touchstone of the Fifth [and Fourteenth] Amendment[s] is compulsion," the State cannot impose sanctions of any kind — including economic sanctions — which are capable of coercing the self-incrimination which the Constitution forbids. *See, e. g., Lefkowitz v. Cunningham, supra,* 431 *U. S.* at 806, 97 *S. Ct.* 2132.

In the present case, the Director informed each plaintiff that assertion of the privilege might subject his license to revocation. A more clear-cut case of patently unconstitutional conduct cannot be imagined. In *Lefkowitz v. Turley, supra,* the Supreme Court struck down as unconstitutional a New York statute which conditioned a contractor's right to transact business with the State upon a waiver of his privilege against self-incrimination. In its holding, the Court emphasized that a waiver "secured under threat of substantial economic sanction cannot be termed voluntary." *Id.* at 82–83, 94 *S. Ct.* at 316. A similar result was reached in *Garrity v. New Jersey, supra.* In that case police officers suspected of having fixed traffic tickets were informed that they would be removed from office if they invoked the privilege during the Attorney General's inquiry into their past conduct. The Court squarely held that the State's actions in this regard were unconstitutional because the police were presented with a choice between surrendering their constitutional rights or their jobs. *Id.* at 498–500, 87 *S. Ct.* at 616. *See also Lefkowitz v. Cunningham, supra* (State cannot remove a political party officer from his position or bar him from holding any public office because he has refused to waive his privilege against compelled self-incrimination).

The similarity of the present case to *Cunningham, Turley,* and *Garrity* leaves no doubt that the Director has transcended constitutional bounds. The revocation of plaintiffs' licenses is at least as substantial an economic sanction as the loss of employment occasioned in *Cunningham* and *Garrity* and

the deprivation of public contracting rights condemned in *Turley*. Consequently, the Director may not in any way attempt to carry out these threats. Should he do so, judicial remedies are available.

In addition to confronting plaintiffs with the threat of license revocation, the Director also stated that a licensee's waiver of his privilege "[would] be a mitigating factor" in any future disciplinary proceedings and that those who insisted upon exercising the privilege "[would] be dealt with accordingly." The State asserts that these statements are not proscribed by *Cunningham*, *Turley* and *Garrity* because the Director did not threaten to "penalize" an assertion of the privilege but merely to "reward" a waiver thereof. In effect, the State is asking this Court to elevate form over substance. Notwithstanding the semantics employed by the Director, it is clear that he is promising to treat more harshly — *i. e.*, to penalize — those licensees who invoke the privilege simply because they will have asserted their constitutional rights. His threats therefore amount to an unconstitutional attempt to coerce a waiver of the privilege.

The State also argues that Supreme Court decisions upholding the validity of "plea bargaining" between a prosecutor and a criminal suspect, *see, e.g., Brady v. United States*, 397 *U. S.* 742, 90 *S. Ct.* 1463, 25 *L. Ed.* 2d 747 (1970), immunize the Director's promises of leniency from successful constitutional attack. In both situations, the State maintains, an individual is induced to incriminate himself in return for favorable treatment. A careful review of the "plea bargaining cases," however, demonstrates clearly that the two situations are not analogous.

Although the Supreme Court has "tolerated" the use of the plea bargaining procedure, *see Bordenkircher v. Hayes*, 434 *U. S.* 357, 360, 98 *S. Ct.* 663, 666, 54 *L. Ed.* 2d 604, 609 (1978), it has consistently stated that such a procedure is not one which should be utilized in an "ideal world" since it results in many criminal suspects incriminating themselves and foregoing their rights to a jury trial. *See, e. g., Borden-*

*kircher, supra,* 434 *U. S.* at 3601, 98 *S. Ct.* at 666. 54 *L. Ed.* 2d at 609; *Blackledge v. Allison,* 431 *U. S.* 63, 97 *S. Ct.* 1621, 52 *L. Ed.* 2d 736 (1977). Nonetheless, the procedure has been upheld against constitutional attack. The Court's main reason for reaching this result is that many concrete advantages flow to both the State and the accused when the latter foregoes his right to trial. As stated in *Brady, supra*:

> \* \* \* For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious — his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages — the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof.
> [397 *U. S.* at 752, 90 *S. Ct.* at 1471; footnote omitted]

*See State v. Corbitt,* 74 *N. J.* 379, 394 ,(1977), aff'd —— *U. S.* ——, 99 *S. Ct.* 492, 58 *L. Ed.* 2d 466 (1978). It is the presence of these substantial benefits flowing to both the State and the accused which justifies the practice of plea bargaining. *See, e. g., Bordenkircher, supra,* 434 *U. S.* at 363, 98 *S. Ct.* at 668, 54 *L. Ed.* 2d at 611; *State v. Corbitt, supra,* 74 *N. J.* at 396.

The "plea bargaining" decisions also emphasize the procedural protections accorded a suspect with whom the prosecutor wishes to negotiate. Thus, the Court has recognized the suspect's right to have counsel present during bargaining sessions, *see, e. g., Brady, supra;* the need for a public record indicating that a guilty plea was knowingly and voluntarily made, *see, e. g., Boykin v. Alabama,* 395 *U. S.* 238, 89 *S. Ct.* 1709, 23 *L. Ed.* 2d 274 (1969) ; and the requirement that a prosecutor's plea bargaining promises not be breached, *see, e. g., Santobello v. New York,* 404 *U. S.* 257, 92 *S. Ct.* 495, 30 *L. Ed.* 2d 427 (1971). Most impor-

tantly, the Court has emphasized that a guilty plea is entered in open court before a judge who must satisfy himself that the plea is voluntarily and intelligently tendered and that a factual basis supports the plea. *See, e. g., Brady, supra,* 397 *U. S.* at 754–755, 90 *S. Ct.* 1463; *State v. Corbitt, supra,* 74 *N. J.* at 396. In this way, defendants are prevented from involuntarily and unnecessarily foregoing their rights to stand trial and to not incriminate themselves.

In the present case, the factors justifying the validity of the plea bargain are simply not present. The Director, unlike a plea bargaining prosecutor, does not possess any evidence pointing to the guilt of any particular plaintiff. Hence, a licensee who waives his privilege will *increase,* not diminish, the potential that he will be subjected to sanctions. The use of such waivers will not result in a saving of scarce judicial resources. Moreover, the Director has not attempted to demonstrate that absent promises of leniency his investigative ability will be severely handicapped.[2] The "mutuality of advantage" emphasized in *Brady* thus is not here present.

In addition, plaintiffs will not be accorded the procedural protections guaranteed a plea-bargaining defendant. No judge is present to ensure that a licensee's waiver is intelligently made after a consideration of all available options and their attendant risks.

The Director's "promises of leniency," as his threats of license revocation, thus constitute an attempt to coerce a

[2]Indeed, recent actions taken by the Director indicate quite forcefully that his ability to police the liquor industry is not dependent upon the use of industry-wide questionnaires and "promises of leniency." On January 2, 1979, the Director charged 30 specific wholesale firms with a total of 56 complaints, including the giving and receipt of unlawful kickbacks, violations of retail credit rules, and conducting illegal sale contests. *See Newark Star Ledger,* January 3, 1979 edition, p. 1, col. 1. The information leading to the filing of these charges could not possibly have been obtained from the questionnaires here at issue, since these questionnaires have not yet been answered by plaintiffs.

waiver of the privilege against self-incrimination. Should the Director seek to enforce these threats, plaintiffs have the right to have his conduct enjoined by a court of law. This is not to say, however, that should the Director uncover evidence of a particular licensee's guilt he may not consider as a mitigating factor that the licensee has volunteered self-incriminatory information. Such a voluntary proffering of information may in certain circumstances bear upon the licensee's repentance for having engaged in illegal conduct and hence his propensity to commit similar crimes in the future. This may be considered in combination with all other aggravating and mitigating circumstances surrounding the perpetration of the offense. What the Director may not do is to implement a course of action whose object is to treat more harshly all those who have invoked their privilege simply because they have elected to exercise their constitutional rights.

## IV

### Plaintiffs' Right To Refuse To Respond At All To The Questionnaire

Without detailed examination into the precise circumstances involved in this controversy, the majority holds that the Constitution does not accord plaintiffs the right to refuse to respond at all to the questionnaire. Instead, it holds that plaintiffs' rights will be sufficiently protected by allowing each licensee to affirmatively assert the privilege with respect to any questions whose answers might tend to incriminate him. Such a holding both contravenes the rationale underlying the privilege against self-incrimination and directly contradicts the holdings of relevant Supreme Court cases. Consequently, I dissent from this portion of the majority's holding.

The basic goal underlying the privilege against self-incrimination is that the government must establish guilt by evidence independently and freely secured and may not

by coercion "prove a charge against an accused out of his own mouth." *Malloy v. Hogan, supra,* 378 *U. S.* at 8, 84 *S. Ct.* 1493. In keeping with this purpose, the privilege "not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute . . . ." *Hoffman v. United States,* 341 *U. S.* 479, 486, 71 *S. Ct.* 814, 818, 95 *L. Ed.* 1118 (1951); *see In re Ippolito, supra,* 75 *N. J.* at 440–441.

In certain circumstances, an individual's affirmative invocation of the privilege with respect to particular questions will just as surely provide a "link in the chain of evidence needed to prosecute" as an outright admission that he had engaged in particular conduct. That is, by bringing his identity to the attention of the State, an individual may significantly increase the possibility of future prosecution. In such a case, the mere invocation of the privilege constitutes an "injurious disclosure" in that it "oblige[s] [an individual] 'to [spotlight his] guilt [in order] to avoid admitting it.' " *Marchetti v. United States, supra,* 390 *U. S.* at 50, 52, 88 *S. Ct.* 697, 704. If such circumstances exist, the individual has a constitutional right not to respond at all to the governmental inquiry. *See, e. g., Marchetti, supra; Grosso v. United States, supra; Haynes v. United States, supra; California v. Byers, supra.*

Of course, the privilege against self-incrimination will not justify an individual in refusing to disclose his name in connection with the administration of all government programs designed to secure information from citizens in order that proper legislative purposes be accomplished. However, it is also clear that an individual need not expressly invoke the privilege in response to a governmental inquiry if such an invocation would create " 'real and appreciable,' and not merely 'imaginative and unsubstantial' hazards" that he would thereby single himself out as the perpetrator of a past offense and serve to focus attention on criminal activities which otherwise might not have come to light. *Marchetti,*

*supra,* 390 *U. S.* at 48, 88 *S. Ct.* 697; *see, e. g., 'Grosso, supra,* 390 *U. S.* at 66–67, 88 *S. Ct.* 709; *Byers, supra,* 402 *U. S.* at 429–430, 91 *S. Ct.* 1535.

The factors to be considered in determining whether such a "real and appreciable" hazard is manifest include the purposes underlying the governmental inquiry, the number and types of persons who are required to respond to the inquiry, and the nature of the questions asked. If the governmental inquiry is non-criminal and regulatory in nature and the questions are facially neutral and directed to the public at large, an individual has no constitutional right to refuse to respond at all. Instead, he may, at most, affirmatively invoke the privilege with respect to particular matters. *See, e. g., California v. Byers, supra; United States v. Sullivan,* 274 *U. S.* 259, 47 *S. Ct.* 607, 71 *L. Ed.* 1037 (1927). Given the wide cross section of persons to whom such inquiries are directed as well as the regulatory context in which the inquiry is conducted, no "real and appreciable" danger exists that the mere invocation of the privilege will come to the attention of law enforcement agencies and lead them to uncover a crime which would otherwise have remained secret.

If, however, the purpose — or at least one purpose — of the governmental inquiry is that of bringing to light past instances of illegal conduct and the questions are directed at a "highly selective group inherently suspect of criminal activities," the individual has the privilege not to respond to the inquiry at all. *Albertson v. Subversive Activities Control Board, supra,* 382 *U. S.* at 79, 86 *S. Ct.* 194; *see, e. g., Marchetti, supra,* 390 *U. S.* at 47–49, 88 *S. Ct.* 697; *Grosso, supra,* 390 *U. S.* at 64–67, 88 *S. Ct.* 709; *Haynes, supra,* 390 *U. S.* at 96–97, 88 *S. Ct.* 722. In such a situation, affirmative invocation of the privilege would have "the direct and unmistakable consequence of incriminating [the individual]" inasmuch as he would have singled himself out to be the target of a criminal investigation. *Marchetti, supra,* 390 *U. S.* at 49, 88 *S. Ct.* 697.

In the present case, the major, if not sole, purpose underlying the Director's inquiry was that of discovering which of the plaintiffs had engaged in past illegal conduct. The questionnaire was not distributed to the public at large but rather to a finite and well-defined group of persons who were suspected of having committed illegal acts. Two of the questions listed (numbers 5 and 6, see *ante* at 515–516) required plaintiffs to state whether they had perpetrated specified offenses and to convey the details surrounding their commission. These questions can thus in no way be labelled "facially neutral." Obligating each plaintiff to identify himself and affirmatively invoke the privilege with respect to these questions would therefore create a "real and appreciable" danger that he would spotlight his guilt and thus substantially increase the potential for prosecution.

Although the remaining questions appear to be facially neutral, uncertainty exists as to whether they were included in order to further DABC's regulatory, as opposed to prosecutorial, goals. In any event, however, the presence of questions 5 and 6 "taints" the entire questionnaire, and hence plaintiffs have a constitutional right not to respond to any question contained therein. *See Marchetti, supra; Grosso, supra; Haynes, supra.* Should the Director, in pursuance of his regulatory functions, desire to reissue the remaining questions in a new questionnaire, the determination of whether plaintiffs can refuse to respond may be addressed at that time.

In a belated effort to justify its holding, the majority asserts that since the director possesses the statutory authority "to subpoena [plaintiffs] and examine them under oath as to the same matters contained in the questionnaire, subject to their right to claim [the] privilege [with respect to particular questions]," no constitutional infirmity can possibly exist in requiring plaintiffs to affirmatively invoke the privilege on the questionnaire. See *ante* at 511. The majority could also have mentioned that the Director could even prevent the affirmative invocation of the privilege by grant-

ing plaintiffs immunity from prosecution. *See, e. g., Lefko-witz v. Turley, supra.* What the majority fails to recognize is that the whole idea behind the privilege is that there are both "right ways" and "wrong ways" to secure evidence, *and agents of the state cannot conduct themselves in the "wrong way."*

Were the Director required to subpoena and interrogate each of the 1,500 members of plaintiff class, a strong possibility exists that the time and expense involved would convince him to abandon or narrow his areas of investigation. At the least, one would expect that the Director would be forced to question only those whom he had some grounds to suspect. Thus the initial burden of choosing those to investigate would properly rest on the Director. In order to avoid such a result, the majority holds that plaintiffs must help the Director uncover evidence which might incriminate themselves. It thus reads the policies and mandates of the Fifth and Fourteenth Amendments right out of the Constitution.

Accordingly, I would hold that plaintiffs have a right to refuse to respond to the questionnaire in any manner.

*For modification and affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For reversal*—Justice PASHMAN—1.