927 A.2d 525

DIVISION OF ALCOHOLIC BEVERAGE CONTROL, PETITIONER–
RESPONDENT, v. MAYNARDS INC., T/A MAYNARDS CAFE,
RESPONDENT–APPELLANT.

Argued November 28, 2006—Decided July 18, 2007.

*Edwin J. Jacobs, Jr.,* argued the cause for appellant (*Jacobs & Barbone, P.A.,* attorneys; *Louis M. Barbone,* on the brief).

*Kevin Marc Schatz,* Senior Deputy Attorney General, argued the cause for respondent (*Stuart Rabner,* Attorney General of New Jersey, attorney; *Lorinda Lasus,* Deputy Attorney General, of counsel; *Richard D. Nasca,* Deputy Attorney General, on the brief).

Justice RIVERA–SOTO delivered the opinion of the Court.

To support his drug habit, Peter Barone, a cook at respondent Maynards, Inc., t/a "Maynards Café," sold drugs on several occasions to an undercover law enforcement officer from his place of employment, a restaurant and bar licensed for the retail sale and consumption of alcoholic beverages. That factual setting presents two issues on appeal. First, we must determine whether alcoholic beverage licensees are strictly liable for the acts of their employees and, if so, whether there are any limits to the application of that standard of liability. Second, assuming vicarious liability for an employee's conduct is found, the appropriate quantum of punishment to be imposed must be ascertained.

We hold that the Alcoholic Beverage Control Act, *N.J.S.A.* 33:1–1 to –97, imposes strict liability on a licensee for a violation of its provisions by its employees. We further hold that, even when strict liability is to be imposed, the fact that repeated unlawful conduct was the direct product of governmental action is relevant,

together with all other relevant factors, in respect of the measure of punishment to be imposed.

## I.

Respondent owns and operates Maynards Café, a restaurant and bar located in Margate. Respondent's principal, Stephen Troiano, and his late father, Al Troiano, have been alcoholic beverage licensees since 1954, having operated Maynards Café since 1966 as a premises licensed for the sale and consumption of alcoholic beverages. Until the events giving rise to this appeal, the Troianos had not had a single violation in respect of their licensed alcoholic beverage operations.

In 2001, the Troianos hired Barone as a cook in the restaurant portion of Maynards Café. Prior to extending an offer of employment to Barone, Stephen Troiano personally interviewed Barone and contacted Barone's prior employers, each of whom provided favorable recommendations. Troiano explained that, in his interview of Barone, he observed that Barone "wasn't a drinker, and I knew he wasn't a drugger from just talking to him[,]" remarking that "when you're in a business all my life, ... you can tell if somebody's up to something. There's certain signs, and you would pick it up." Barone commenced his employment with respondent in May 2001, where, in Troiano's words, "everybody liked him. The older people loved him. We had a lot of old, disabled people that he would cater to and bring their food to. He was a well liked person[.]"

After he started work at Maynards Café, Barone developed an addiction to cocaine. In order to support his addiction, Barone started making small cocaine sales as an intermediary for and on behalf of his supplier, William Foglio. Those sales did not go undetected. In March 2002, the Margate Police Department received an informant's tip that Barone was selling cocaine. Based on that information, on March 8, 2002, undercover Officer Keith Carmack of the Atlantic County Prosecutor's Office Narcotics Strike Force Unit was introduced by the confidential informant

to Barone at Maynards Café and, later that evening, made the first of a series of purchases of cocaine from Barone. Carmack explained, however, that on that first sale, Barone was not then working at Maynards Café; Barone had worked earlier that day, completed his work, gone home, and returned to Maynards Café to socialize.

On April 17, 2002, Carmack returned to Maynards Café, sought out Barone, and inquired whether he could buy two $100 bags of cocaine. Barone told Carmack to wait and, sometime later, waved Carmack to join him in the bathroom. Once in the bathroom, Carmack asked if he could increase his order to three $100 bags of cocaine, and Barone explained it would not be a problem. Carmack handed $300 to Barone and was told to wait at the bar. A short while later, Barone called out to Carmack, telling him that his "order was up," and Carmack approached Barone at the counter in the kitchen area of the restaurant. Barone handed Carmack a white bag customarily used for take-out food orders; it contained the three packets of cocaine Carmack had purchased. Generally following that pattern—with Carmack approaching Barone at Maynards Café asking to purchase cocaine; Barone waving Carmack into the bathroom, where Carmack would hand the money to Barone; Barone later calling out to Carmack that his "order" was ready; and Carmack receiving the drugs from Barone in a white "take-out" bag at the kitchen counter area—Carmack purchased cocaine from Barone on five additional dates over the next two-and-one-half months. Carmack's final attempt to purchase cocaine from Barone, however, did not bear fruit as, by that point, Barone's supplier, Foglio, had been arrested and his drug supply seized.[1] Although later advised of these developments, at that time, Carmack was unaware of Foglio's arrest.

---

[1] Barone testified that, notwithstanding Foglio's inability to provide additional cocaine for sale, Barone already had decided to end his dependence on drugs and seek help for his addiction. According to Barone, it was that decision that was the catalyst for his refusal to sell any more cocaine to Carmack.

On August 20, 2002, three months after Carmack's unsuccessful last attempt to purchase cocaine from Barone, Barone was arrested and, on October 31, 2002, the Atlantic County grand jury returned an indictment against both Barone and Foglio. The grand jury charged Barone with one count of second-degree distribution of cocaine, in violation of *N.J.S.A.* 2C:35–5(a)(1) and – 5(b)(2); two counts of second-degree conspiracy to distribute cocaine, in violation of *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:35–5(b)(4); six counts of second-degree distribution of cocaine within five hundred feet of a public housing facility, public park, or public building, in violation of *N.J.S.A.* 2C:35–7.1; six counts of third-degree distribution of cocaine, in violation of *N.J.S.A.* 2C:35–5(a)(1) and –5(b)(3); five counts of third-degree conspiracy to distribute cocaine, in violation of *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:35–5(b)(3); and six counts of third-degree possession of cocaine, in violation of *N.J.S.A.* 2C:35–10(a)(1). On December 12, 2002, pursuant to a plea agreement, Barone pled guilty to one count of second-degree distribution of cocaine and one count of second-degree conspiracy to distribute cocaine in exchange for a recommended sentence of not more than four years imprisonment. The plea agreement further provided, however, that Barone would apply for, and the State would not object to, the imposition of special probation requiring his participation in a rehabilitation program, as provided in *N.J.S.A.* 2C:35–14. On January 31, 2003, finding that Barone was "an addict who will remain lawless until the addiction is dealt with effectively[,]" the trial court granted Barone's application for special probation, "afforded [him] this opportunity to address his addiction[,]" and sentenced him to a five-year term of special probation.[2]

In the interim, petitioner the Division of Alcoholic Beverage Control (State ABC) filed charges against respondent, alleging

---

[2] The grand jury indictment also named Foglio, Barone's supplier, in several counts. Those charges are not relevant to this discussion and, hence, are not outlined here. What is relevant is that, ultimately, he too pled guilty but, unlike Barone, was sentenced to four years imprisonment.

that, on six separate occasions in April and May 2002, it had "allowed, permitted or suffered on [its] licensed premises, unlawful activity pertaining to controlled dangerous substances ... involving [its] employee, viz., Peter Barone[,] in violation of *N.J.A.C.* 13:2–23.5(b)." [3] That notice of charges explained that "[t]he total penalty sought by the [State ABC] is 540 days suspension of ... license." It also emphasized that the State ABC "will seek an additional 190 days suspension based upon aggravating circumstances, therefore the total penalty sought by the [State ABC] is 730 days suspension of ... license." Respondent entered a plea of not guilty in respect of those six charges and requested that "this matter be forwarded for a hearing."

After the matter was referred to the Office of Administrative Law as a contested case, the State ABC moved for summary decision, pursuant to *N.J.A.C.* 1:1–12.5(b). As noted by the Administrative Law Judge (ALJ) in an initial decision dated February 5, 2004, the State ABC alleged that the Alcoholic Beverage Control Act "imposes near strict liability on the holders of liquor licenses for illegal activity on the licensed premises" so that "whenever there is a failure to prevent the prohibited conduct by the licensee, regardless of knowledge, there is responsibility, and the mere fact that the violation occurred is sufficient to establish a licensee's guilt[.]" Thus, the State ABC "contend[ed] that it need only establish the occurrence of these activities in order to establish that it is entitled to summary decision in this matter." In contrast, and relying principally on *Ishmal v. Division of Alcoholic Beverage Control*, 58 *N.J.* 347, 277 *A.*2d 532 (1971), respondent

---

[3] The State ABC simultaneously filed separate charges against respondent alleging that, on three separate instances on July 3, 2002, it "sold, served or delivered, or allowed, permitted or suffered the direct or indirect sale, service, delivery or consumption of alcoholic beverages to/by a person under the legal age for purchase or consumption of alcoholic beverages ... in violation of *N.J.A.C.* 13:2–23.1(a)" in respect of three minors. In that notice of charges, "[t]he total penalty sought by the [State ABC] is 45 days suspension of ... license." The adjudication and penalty imposed in respect of those charges is not the subject of this appeal and, hence, we need not address them.

asserted that "it did not allow, permit or suffer unlawful activity on its premises" and that "the measures undertaken by a licensee to prevent unlawful activity on its premises create genuine issues of material fact concerning a licensee's efforts to eradicate such activity."

In his February 5, 2004 initial decision, the ALJ concluded that "even in the absence of knowledge [of unlawful activity on the licensed premises] on the part of the licensee, whenever there is a failure to prevent the prohibited conduct there is responsibility, and the fact that the violation occurred is sufficient." However, the ALJ found that "the measures undertaken by a licensee to prevent unlawful activity on the licensed premises may be relevant [ ] not only to determine guilt or innocence, but also to determine the appropriateness of a penalty if there is a finding of guilt." As a result, the ALJ denied the State ABC's motion for summary decision.

On the State ABC's application for interlocutory review, the Director of the State ABC reversed the ALJ's findings. According to the Director, the ALJ's reliance on *Ishmal* was misplaced. In the Director's view, "*Ishmal* did not involve illegal activity by an employee[ ]" while, in this case, Barone was employed by respondent. The Director concluded that "[t]his case is more like *Red Klotz* [4] and *12 South,* [5] in which an employee was involved in illegal activity[,] and efforts, if any, undertaken by the licensee to avoid illegal activity were considered as mitigating factors in determining penalty only." As a result, the Director found that "there is no genuine issue of material fact involving the drug charges and [respondent] is guilty of six separate violations of *N.J.A.C.* 13:2–23.5(b)." The Director "remand[ed] this matter to

[4] *Div. of Alcoholic Beverage Control v. Red Klotz Enters., Inc.,* 6 *N.J.A.R.* 13 (1982).

[5] *12 South, Inc. v. Mun. Bd. of Alcoholic Beverage Control of Atl. City,* OAL Docket Nos. ABC 700–97 and 6502–97 (1998), *aff'd,* Docket No. A–1057–98T3 (App.Div.), *certif. denied,* 165 *N.J.* 490, 758 *A.2d* 649 (2000).

the Office of Administrative Law for a hearing on the issue of penalty only[,]" ruling that, "[a]t the hearing, the [State ABC] may present evidence of any aggravating factors and [respondent] may present evidence of any mitigating factors."

At the remand penalty hearing, the State ABC presented only the testimony of Carmack to prove any aggravating factors relevant to the charges that respondent had "allowed, permitted or suffered" the sale of controlled dangerous substances on its premises by its employee, Barone. Carmack's direct testimony recounted how he was introduced to Barone by a confidential informant and how, on six separate occasions, he purchased cocaine from Barone while at Maynards Café. On cross-examination, Carmack admitted that "there was never any cocaine at Maynards [Café], that it was always brought there by Foglio[,]" Barone's supplier. Carmack also admitted that he knew that there was a surveillance system within Maynards Café, that a review of any tape-recorded versions of his transactions with Barone would disclose nothing out of the ordinary, and that respondent's purpose in maintaining a video surveillance system was to "look[ ] for any problems."[6] Carmack conceded further that respondent conducts a "kitchen and take[-]out business" and that the manner and packaging by which he received the cocaine from Barone "was what to the outside world looked like a take[-]out order[.]"

Carmack testified that, although search warrants were secured and executed against both Barone and Foglio, no search warrant was ever sought for Maynards Café because the authorities understood that all of Barone's cocaine sales were made from deliveries made to Barone from Foglio and, more to the point, no controlled dangerous substances ever had been stored at Maynards Café. When specifically asked for "the hard concrete evidence that you

---

[6] At a significant expense, respondent maintains a video surveillance system consisting of fourteen cameras, nine of which are located inside the restaurant and bar areas; the only interior portions of Maynards Café that are not subject to video surveillance are the bathrooms.

can give to this Court under oath that one other employee knew anything about what Barone was doing[,]" Carmack promptly answered: "No, sir, I don't have any." Carmack admitted that "[t]he reason cocaine is getting through the doors of Maynards [Café] in Margate is [that he was] making a deal with a drug addict [Barone] knowing that he will call Egg Harbor Township [where Foglio lived] and have Foglio bring it to [Maynards Café] so he [Barone] can hand it to [Carmack.]" Finally, Carmack admitted that, as a result of their surveillance activities, the investigators knew that, as of the first undercover drug purchase from him, Barone's supplier was Foglio.

Respondent then presented its case in mitigation of punishment. Its prime witness in mitigation was Stephen Troiano, respondent's principal,[7] who recounted in detail his family's ties to the Margate community and its many civic and charitable endeavors on behalf of that community, particularly law enforcement. An impressive array of local witnesses also testified in respondent's favor.[8] We

---

[7] In the interim, Al Troiano, Stephen's father, had died.

[8] They included, in order, Joel Mayer, Esq., a former Assistant Prosecutor in Atlantic County who had supervised its Narcotics Strike Force; Timothy Mooney, a detective sergeant and twenty-six-year veteran of the Atlantic City Police Department with significant experience in narcotics investigations; Edwin McMeekin, a retired sergeant and twenty-six-year veteran of the Margate City Police Department, who explained that Maynards Café had never posed a drug problem; Edward Humphreys, a former Code Enforcement Officer for the City of Margate; Vaughan Reale, the then-Mayor of the City of Margate; Noreen DiMarcello, a fellow restaurant/bar owner and a former employer of Barone who provided a positive employment recommendation for Barone when he applied for employment with respondent; Dennis Levinson, the County Executive for Atlantic County; Sandy Vespertino, the Ventnor City Commissioner of Public Works and Recreation; Joseph Schafer, a retired twenty-seven-year veteran of the Ventnor and Atlantic City Police Departments, and the Ventnor City Commissioner of Revenue and Finance; Robert P. Gross, Deputy Chief Executive Officer of the Delaware River Port Authority and the former Executive Director of the Atlantic County Improvement Authority; Timothy Kreischer, the Mayor of the City of Ventnor; Nicholas Russo, a former member of the Atlantic City Police Department, a former investigator with the Atlantic County Prosecutor's Office, a former supervisor of the New Jersey Attorney General's Organized Crime and

need not recount in detail the testimony presented by those witnesses. It is sufficient to note that each witness testified that respondent operated a clean, wholesome environment that would not tolerate illicit drugs on its premises; that, as proof of the strength of their views, they personally patronized Maynards Café together with their spouses and children; and that they were familiar with and favorably impressed by respondent's and the Troianos' civic and charitable contributions and support for law enforcement.

Respondent's mitigation proofs also included the certifications of four absent witnesses who certified that they personally frequented Maynards Café; had never observed illicit activity on the premises; and were familiar with respondent's and the Troianos' many charitable and civic contributions and cooperation with law enforcement.[9] In further support of its plea in mitigation, respondent also tendered eighty-one character reference letters, and a petition in support containing approximately 1,800 signatures. The aggregate of those proofs overwhelmingly established respondent as a responsible business that would never tolerate drug sales on its premises.

That conclusion was buttressed by Barone himself, who testified that he became addicted to cocaine after he was employed by

---

Narcotics Bureau, and a former Assistant Professor of Criminal Justice at Atlantic Cape Community College; James Whelan, former Mayor of Atlantic City and current New Jersey State Assemblyman; John Heenan, a thirty-plus-year member of the Atlantic City Police Department who, as a sergeant in criminal investigations, had been assigned to the Atlantic County Narcotics Task Force; Bernard McCabe, a fellow restaurant/bar owner and a former employer of Barone who also provided a positive employment reference for Barone's application for employment with respondent; John Costello, a registered nurse and part-time disc jockey at Maynards Café; and John Swift, the Margate City Commissioner of Public Safety.

[9] They were William H. Ross, III, former Mayor of Margate City; James P. Savio, former Margate Municipal Prosecutor and current Margate Municipal Court Judge; Steven W. Smoger, former Margate Municipal Court Judge; and Edward Broome, a retired police lieutenant who served with the Atlantic County Narcotics Strike Force for thirteen years.

respondent; that, inferentially, he sold cocaine to support his personal habit; that he conducted his drug sales covertly because he knew that behavior was strictly prohibited; and that, if his activities had become known to his employer, he "would've been fired right at the spot." Barone, who had by this time completed a court-ordered drug rehabilitation program and had relocated to another county, testified as follows:

Q. .... Did you actually start to use drugs sometime after you were hired?

A. Yes.

....

Q. The nature of the drug?

A. Co — it was cocaine.

Q. Was there ever, ever, ever any cocaine at Maynards [Café]?

A. Me. No, I had never seen anything.

Q. Did you ever see any employee at Maynards [Café] with cocaine?

A. No.

Q. Had you ever seen any patron at Maynards [Café] with cocaine?

A. No.

Q. The only cocaine that you were able to sell to the undercover Investigator Carmack was cocaine that was brought to Maynards [Café] by Fo[g]lio; is that right?

A. Exactly right, sir.

In a comprehensive initial decision dated February 10, 2005, the ALJ summarized the proofs and testimony presented to him over a four-day contested hearing. Explaining that "[a]s a result of the Director's decision granting [the State ABC's] motion for summary decision as to the charges, respondent has been ... found guilty of six counts of violation of *N.J.A.C.* 13:2–23.5(b)[,]" the ALJ defined his task as assessing the aggravating and mitigating factors in order to fix an appropriate penalty. In completing that task, the ALJ was guided by the Director's determination that "the presumptive penalty for the sale of narcotics on a licensed premises involving an employee is 90 days [and because respondent] has been found guilty of six violations of *N.J.A.C.* 13:2–23.5(b), the presumptive penalty is 540 days." Concluding that the State ABC "presented no proofs of the existence of any aggravating circumstances[,]" the ALJ thus focused on "deter-

min[ing] whether the proofs presented by respondent are sufficient to mitigate further the presumptive penalties and, if so, to what extent."

The ALJ found that "the violations involving the sales of CDS were committed by Mr. Barone in a careful and secretive manner, and that these violations were virtually undetectable, despite an extensive surveillance system on the premises and the training and awareness of security personnel on the premises." He found that "this is a mitigating factor which should be applied in this matter." The ALJ also found that "there exists no evidence of involvement, complicity or acquiescence by management [ ] in the activities of Mr. Barone." He specifically found that "the prior actions and conduct of the Troianos in monitoring th[e] premises and in employing security to prevent violations are such as to establish that they were in no way involved in the violations" and that "this is an additional mitigating factor[.]"

The breadth and depth of respondent's commitment to operate its establishment lawfully and responsibly were recognized by the ALJ, who found that "respondent engaged in extraordinary efforts to detect and eradicate illegal activities of any kind on its premises[,]" listing twenty separately numbered categories of responsible efforts consistently expended by respondent. On that basis, the ALJ concluded that "respondent, its management, and staff[ ] are proactive and sensitive to the rules and regulations promulgated by the [State] ABC and seriously endeavor to detect and eradicate illegal activities upon the licensed premises." Finding "as an additional mitigating factor the fact that [the Troianos] have held liquor licenses since 1954 and do not have a single violation on their record until the present matter[,]" the ALJ found that

the character of the respondent is such as to indicate that the occurrence of another offense is unlikely. It was established without question that the Troianos and respondent are well respected members of the community. Respondent operates a secure and well-policed establishment, it is family-oriented, and it is not a drug hangout. It is patronized by police officers, elected officials, and other reputable citizens and residents of the area. Its reputation in the community is that there is no toleration for illegal activities on the premises. Many of the public

officials and other reputable citizens stated that they would not patronize May-nards [Café] if it did not have such an excellent reputation.

In sum, the ALJ found that "these are additional mitigating factors to be considered in this matter."

Addressing the length of the suspension to be imposed, the ALJ found that "the imposition of a lengthy period of suspension would entail excessive hardship to respondent and his employees and their dependents." Reasoning that "administrative penalties are remedial in nature, designed to promote public safety and to reform rather than punish wrongdoers and not for the purpose of frightening or deterring others, even though that may be an incidental result[,]" the ALJ concluded there was a salutary purpose in the exercise of lenity in the circumstances presented. He explained that "if the penalty is reduced for the mitigating factors [ ] discussed, licensees would be encouraged to make the expenditures and engage in other efforts similar to respondent, such as training employees to improve security and surveillance of their premises and being good members of the community." The ALJ ultimately concluded that "the penalty in this matter should be reduced to a sixty (60) day suspension." However, the ALJ

urge[d] the Director [of the State ABC] to exercise his sole discretion pursuant to N.J.A.C. 13:2–19.12 to permit the suspension to be the subject [of] a compromise in lieu of suspension for a substantial portion of the penalty, provided respondent submits an appropriate written proposal to the Director setting forth the reasons why the offer should be accepted.

Both the State ABC and respondent filed exceptions to the ALJ's initial decision. The State ABC claimed that a sixty-day suspension for an aggregate of six violations charging narcotics activities by an employee was insufficient. It noted that each such violation carries a presumptive penalty of a ninety-day license suspension—or a total suspension of 540 days—and that the State ABC had originally sought to enhance the penalty "to 730 days from the precedent 540 day penalty due to the repetitive nature of the violations." Thus, claiming that respondent's mitigation proofs already had been accounted for by the elimination of the State ABC's original request for an enhanced penalty, it urged that the presumptive 540-day suspension be imposed.

Respondent raised four exceptions. First, it claimed that, despite the Director's entry of a summary decision on the issue of respondent's liability, it nevertheless should have been permitted to litigate the issue of liability at the remand hearing. Second, respondent argued that, because the ALJ "concluded that the violations in question were 'virtually undetectable,' he should have found that [the State ABC] failed to prove [that respondent] allowed, permitted, or suffered a violation to occur." Next, it argued that, in light of its extraordinary proofs in mitigation, the penalty should have been mitigated even more than the ALJ had recommended. Finally, following the ALJ's recommendation, respondent proposed that it "be allowed to pay a fine in lieu of suspension."

Rejecting in large measure the ALJ's findings of mitigating factors, the Director of the State ABC ordered that respondent's plenary retail consumption alcoholic beverage license be suspended for a total of 370 days, 240 of which were to be "held in abeyance and, if [respondent] is found guilty of another violation(s) of *N.J.A.C.* 13:2–23.5(b) within two years … it will have to serve those 240 days, in addition to any penalty imposed for the subsequent violation(s)[.]"

Respondent appealed and simultaneously sought a stay of the Director's order pending appeal. The Director denied that application, but the Appellate Division granted an emergent stay pending the disposition of the appeal. In an unpublished, per curiam opinion, the panel vacated the stay [10] and affirmed the Director's determination. Distinguishing *Ishmal*, the Appellate Division explained that

[h]ere, unlike the facts in *Ishmal*, an employee participated in the illegal activity. Moreover, unlike the facts in *Ishmal*, where the drug activity was prevalent,

---

[10] The panel did grant respondent's later motion for a stay pending disposition of respondent's petition for certification to this Court. That stay has remained in place throughout the pendency of these proceedings and, in light of our disposition of this appeal, will remain in place until the ordered remand is completed and a final order on remand is issued.

[respondent] never discovered the illegal conduct, despite its security and detection systems, and thus there was no evidence that it affirmatively attempted to eradicate the problem by calling the police or otherwise interceding. The facts established that [respondent] "suffered" the illegal activity. Indeed, [respondent] concedes it did not have knowledge of the drug dealing by its employee.

The panel also rejected respondent's claim that it was improper to impose liability on it for Barone's actions when Barone himself admitted that he took pains to hide his behavior from his employer. The Appellate Division concluded that notice of illegal behavior by an employee is not a condition precedent to the imposition of vicarious strict liability in a regulatory setting. Finally, rejecting respondent's assertion that the penalty imposed was excessive, the panel found that the terms of the Director's order were within his discretion and that no abuse of discretion had been demonstrated.

We granted respondent's petition for certification. *Div. of Alcoholic Beverage Control v. Maynards Inc.*, 186 *N.J.* 608, 897 *A.*2d 1062 (2006). For the reasons that follow, we affirm the judgment of the Appellate Division in respect of the imposition of strict liability on respondent for the criminal acts of its employee on the licensed premises, but we reverse and remand to the Director for a re-determination of the penalty to be imposed.

## II.

Focusing on the covert and undetectable nature of Barone's drug dealing, respondent argues that, in light of its extensive efforts and history of lawful compliance, it could not be deemed to have "allowed, permitted or suffered on [its] licensed premises, unlawful activity pertaining to controlled dangerous substances ... involving [its] employee, viz., Peter Barone[,] in violation of *N.J.A.C.* 13:2–23.5(b)[,]" as charged by the State ABC. Respondent urges that, in those circumstances, the application of vicarious strict liability is inappropriate and, even more so, in violation of the standard announced in *Ishmal*. Invoking public policy considerations, respondent condemns a rule that indiscriminately punishes a liquor licensee for an employee's undetectable criminal

act as contrary to the public purpose of encouraging lawful behavior by licensees. Respondent asserts that a licensee that "meticulously" observes its obligations and employs "every human and electronic crime prevention and detection technique, should not be punished for failing to do the impossible." Finally, in the circumstances presented, respondent questions the wisdom of harshly penalizing an acknowledged and recognized upstanding corporate citizen and its employees.

The State ABC reasserts this State's policy of imposing strict liability on those who participate in pervasively regulated industries such as the retail sale of alcoholic beverages. For that reason, the State ABC argues that it was proper to find respondent liable for Barone's actions. It also asserts that the public policy of this State is furthered by strict enforcement of the Alcoholic Beverage Control Act and its regulations, and that the Director's decision, as affirmed by the Appellate Division, is in harmony with that public policy. Indeed, in the State ABC's view, in light of the strictly regulated environment of alcoholic beverage sales, any failure to strictly enforce the regulatory prohibition concerning the sale of illicit drugs on licensed premises runs contrary to that public policy.

## III.

The Alcoholic Beverage Control Act contains an explicit declaration of public policy. It explains, in relevant part, that it is the express public policy of New Jersey "[t]o strictly regulate alcoholic beverages to protect the health, safety and welfare of the people of this State[,]" *N.J.S.A.* 33:1–3.1(b)(1), and "[t]o protect against the infiltration of the alcoholic beverage industry by persons with known criminal records, habits or associations." *Id.* at 1–3.1(b)(5). That legislative declaration of public policy makes abundantly clear that "[p]articipation in the industry as a licensee under this act shall be deemed a revocable privilege conditioned upon the proper and continued qualification of the licensee." *Ibid.*

The Alcoholic Beverage Control Act squarely places on the Director of the State ABC "the duty . . . to supervise the manufacture, distribution and sale of alcoholic beverages in such a manner as to fulfill the public policy and legislative purpose of this act[.]" *N.J.S.A.* 33:1–3. It vests in the Director the broad authority to "make such general rules and regulations and such special rulings and findings as may be necessary for the proper regulation and control of the manufacture, sale and distribution of alcoholic beverages and the enforcement of this [Act.]" *N.J.S.A.* 33:1–39. Among the powers legislatively granted to the Director is the power to suspend or revoke a liquor license for "[a]ny violation of rules and regulations[.]" *N.J.S.A.* 33:1–31(g).

In the exercise of that authority, the Director has adopted regulations that comprehensively prohibit "allow[ing], permit[ting] or suffer[ing] in or upon the licensed premises" any unlawful activity involving illicit drugs. *N.J.A.C.* 13:2–23.5. That regulation specifically provides that

[n]o licensee shall allow, permit or suffer in or upon the licensed premises any unlawful possession of or any unlawful activity pertaining to:

1. Narcotic drugs;

2. Controlled dangerous substances as defined by the New Jersey Controlled Dangerous Substances Act . . .;

3. Controlled dangerous analogs as defined by the Comprehensive Drug Reform Act of 1987 . . .;

4. Any prescription legend drug, in any form, which is not a narcotic drug or a controlled dangerous substance or analog, as so defined; or

5. Drug paraphernalia as defined by *N.J.S.A.* 2C:36–1.

[*N.J.A.C.* 13:2–23.5(b).]

The Director also has defined the overall standard of liability to be imposed for violations of the Alcoholic Beverage Control Act and its regulations. Echoing the specific standard set forth in *N.J.A.C.* 13:2–23.5(b) for illicit drug transactions on licensed premises, the regulations provide that, "[u]nless otherwise specified by statute or rule, a licensee is guilty of a violation of the Alcoholic Beverage Control Act if it allows, permits or suffers the violative act on or about its licensed premises." *N.J.A.C.* 13:2–23.28(a). The regulations further provide that

[i]n disciplinary proceedings brought pursuant to the alcoholic beverage law, it shall be sufficient, in order to establish the guilt of the licensee, to show that the violation was committed by an agent, servant, employee or patron [11] or the licensee. The fact that the licensee did not participate in the violation or that his agent, servant or employee acted contrary to instructions given to him by the licensee or that the violation did not occur in the licensee's presence shall constitute no defense to the charges preferred in such disciplinary proceedings.
[*N.J.A.C.* 13:2–23.28(c).]

 A review of the intersection of the legislative mandate with those regulations adopted to implement that mandate requires resort to fundamental principles:

We start with the premise that we must give great deference to an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible. Such deference is appropriate because it recognizes that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are particularly well equipped to read and to evaluate the factual and technical issues that rulemaking would invite. Consequently, agency rules are accorded a presumption of validity and reasonableness, and the challenging party has the burden of proving the rule is at odds with the statute.

Despite that deference, a rule will be set aside if it is inconsistent with the statute it purports to interpret. That is, the agency may not under the guise of interpretation give the statute any greater effect than its language allows. Thus, if the regulation is plainly at odds with the statute, we must set it aside.

[*In re Freshwater Wetlands Prot. Act Rules*, 180 *N.J.* 478, 488–89, 852 *A.*2d 1083 (2004) (citations, internal quotation marks, and editing marks omitted).]

It is to the determination of whether the regulation respondent is alleged to have violated is consistent with the Alcoholic Beverage Control Act that we now turn.

### A.

Respondent urges that *N.J.A.C.* 13:2–23.5(b) and *N.J.A.C.* 13:2–23.28(a)—which speak in terms of liability flowing from a licensee "allowing, permitting or suffering" in or upon the licensed premises—are at odds with the imposition of vicarious strict liability pursuant to *N.J.A.C.* 13:2–23.28(c). Stated differently, respondent argues that if a licensee is to be held strictly vicariously liable for the acts of its employees, then whether the licensee "allowed,

---

[11] Because it is not at issue in this case, we express no view in respect of this regulation's reach concerning the liability of a licensee for the acts of a patron.

permitted or suffered" the illegal act by its employee is simply meaningless. Respondent underscores that the notice of charges filed against it alleged that it "allowed, permitted or suffered on [its] licensed premises, unlawful activity pertaining to controlled dangerous substances ... involving [its] employee, viz., Peter Barone[,] in violation of *N.J.A.C.* 13:2–23.5(b)." Thus, respondent asserts that it is logically and legally inconsistent to charge a licensee with having "allowed, permitted or suffered" certain behavior by an employee when, without more, the plain act by the employee will render the employer vicariously liable without regard to any preventative efforts that may have been expended by the employer.

Respondent's attempt to avoid the imposition of vicarious strict liability for the acts of its employee must be rejected. It is beyond question that " 'the liquor industry is affected with a public interest' and 'has been subject to intense State regulation and control ....' " *State v. Williams,* 84 *N.J.* 217, 223, 417 *A.*2d 1046 (1980) (quoting *Heir v. Degnan,* 82 *N.J.* 109, 114, 411 *A.*2d 194 (1980)). This is so because "a state may prohibit liquor sales completely." *Ibid.* (citing *Gillhaus Beverage Co., Inc. v. Lerner,* 78 *N.J.* 499, 509, 397 *A.*2d 307 (1979)). As a result, "[h]istorically, the liquor industry has been viewed as a sensitive industry and has been strictly regulated." *Ibid.*

In the context of the pervasive regulation of the liquor industry, it has been consistently held that liquor licensees are strictly liable for illicit drug transactions within the licensed premises, whether committed by the licensees themselves, their employees or by others. *See 12 South, Inc., supra,* OAL Docket Nos. ABC 700–97 and 6502–97 (twelve undercover narcotics sales, including sales by employee, warrant 115–day suspension, "thirty days to be 'immediately' served and the balance held in abeyance," because licensee's actions notifying police of knowledge of drug transactions "may still be considered as a mitigating factor in determining the penalty to be imposed"); *Bd. of Comm'rs of Nutley v. Rockyn Juke Box, Inc.,* 95 *N.J.A.R.*2d (ABC) 81 (1994) (four cocaine sales

in bar made by patron under circumstances "where the licensee or her employees should have known what was taking place" warrant license revocation); *Dir., Div. of Alcoholic Beverage Control v. Vanmar Liquors, Inc.,* 92 *N.J.A.R.*2d (ABC) 9 (1992) (three narcotics transactions conducted openly in bar results in 165–day license suspension); *Div. of Alcoholic Beverage Control v. Doug–Kar Corp.,* 92 *N.J.A.R.*2d (ABC) 21 (1991) (license revocation appropriate where owner and waitress/employee engage in sales of narcotics to undercover police officer); *Fischer v. Mayor and Council of Garfield,* 92 *N.J.A.R.*2d (ABC) 1 (1991) (one admitted cocaine sale by bar owner sufficient for license revocation); *T.L.S., Inc. v. City of Bayonne,* 9 *N.J.A.R.* (ABC) 403 (1986) (imposing sixty-day suspension for two sales of cocaine on licensed premises under circumstances where licensee should have been aware of illicit transactions; leave granted to tender monetary offer in compromise in lieu of suspension); *Canal St. Pub, Inc. v. Paterson Mun. Bd. of Alcoholic Beverage Control,* 6 *N.J.A.R.* (ABC) 221 (1982) (imposing ninety-day suspension for hypodermic needles and syringes found in employee's purse where licensee failed to expressly warn employees to avoid violations of law); *Red Klotz Enters., Inc., supra,* 6 *N.J.A.R.* (ABC) at 13 (licensee strictly liable for two narcotics sales by part-time bartender; based on licensee's efforts to eradicate drug problem in and around its premises, penalty mitigated to thirty-day license suspension and offer in compromise in lieu of suspension allowed); *Valdivia's Bar, Inc. v. Elizabeth City Council,* 6 *N.J.A.R.* (ABC) 161 (1981) (license revocation ordered when president of licensee found in possession of cocaine at bar); *Div. of Alcoholic Beverage Control v. Ty–Dan Corp.,* 5 *N.J.A.R.* (ABC) 273 (1980) (imposing thirty-day suspension where bartender observed patrons light what bartender recognized as marijuana cigarette yet, other than ask that patrons cease, took no other action); *see also Country Hearth, Inc. v. Old Bridge Twp. Council,* 221 *N.J.Super.* 293, 534 *A.*2d 424 (App.Div.1987) (remanding license revocation for correct-ed proofs of amount of drug activities on licensed premises).

■ Moreover, the fundamental argument advanced by respondent—that, despite its best efforts, it could not have stopped what it did not know was occurring—is legally unavailing. Respondent was charged with "allowing, permitting or suffering" the illegal sale of cocaine in or upon the licensed premises. At least in respect of respondent having "suffered" these illegal acts, respondent's knowledge or preventative efforts are irrelevant. It has long been the law in New Jersey that, in the context of the regulation of alcoholic beverages, "the word 'suffer' ... imposes responsibility on a licensee, *regardless of knowledge,* where there is a failure to prevent the prohibited conduct by those occupying the premises with his authority." *Essex Holding Corp. v. Hock,* 136 *N.J.L.* 28, 31, 54 *A.*2d 209 (Sup.Ct.1947) (emphasis supplied); *accord N.J. Div. of Alcoholic Beverage Control v. H & H Wine & Spirit Shop, Inc.,* 216 *N.J.Super.* 532, 536, 524 *A.*2d 466 (App.Div. 1987); *Benedetti v. Bd. of Comm'rs of Trenton,* 35 *N.J.Super.* 30, 34, 113 *A.*2d 44 (App.Div.1955) (holding that regulatory "responsibility adheres regardless of knowledge where there is a failure to prevent the prohibited conduct by those in the premises with his authority"); *In re Gutman,* 21 *N.J.Super.* 579, 582, 91 *A.*2d 615 (App.Div.1952) (concluding that "[i]n some circumstances, where, regardless of his knowledge, the licensee may fail to prevent a prohibited act on his premises, he may be charged with the responsibility therefor"). In the same context as presented in this case, we have held that "[i]t was clearly within the power of the Legislature to provide that the licensee should be liable for activities upon the licensed premises *even in the absence of knowledge* thereof by the licensee." *Mazza v. Cavicchia,* 15 *N.J.* 498, 506, 105 *A.*2d 545 (1954) (emphasis supplied).[12] We made clear that

---

[12] *Mazza* also addressed the separate issue of the propriety of the hearing procedures then afforded by the State ABC. *Supra,* 15 *N.J.* at 511–26, 105 *A.*2d 545. With the creation of the Office of Administrative Law, *L.* 1978, *c.* 67, that separate portion of *Mazza* was superseded. *See generally N.J. Civil Serv. Ass'n v. State,* 88 *N.J.* 605, 443 *A.*2d 1070 (1982). *Mazza* 's relevance in respect of the

[t]he rule in question [providing for strict liability on a licensee for the violations of its agents, servants, or employees] comes clearly within the delegated authority of the Director [of the State ABC] as a reasonable regulation in the field of alcoholic beverage control. The Director has the power to make the licensee responsible for the activities upon the licensed premises. In fact, it is difficult to see how the [State ABC] could properly maintain discipline in this field if in each case it had to show knowledge by the licensee of all the activities upon the premises. This would leave the door open to evasion of the Alcoholic Beverage [Control] Law and the many rules of the Director promulgated thereunder and would make the enforcement of the law an impossibility.

[*Id.* at 509, 105 *A.*2d 545.]

A stark lesson emerges from that unbroken line of authorities: acceptance of the privileges and benefits of a liquor license in this State carries with it the burden that licensees are held to an exacting standard of conduct, one that, at least in respect of the use or transfer of illicit drugs, does not admit of traditional defenses to liability. For those reasons, respondent's liability defenses must be rejected in favor of the long-standing rule that a liquor licensee is strictly and vicariously liable for any transactions on its licensed premises involving its employees and illicit drugs or drug paraphernalia.

That reasoning also leads to our rejection of respondent's reliance on *Ishmal.* In that case, a liquor licensee took reasonable and repeated steps to prevent customers from engaging in drug transactions, including unceasing complaints to the authorities coupled with requests for assistance. We explained that "Mrs. Ishmal seriously endeavored to eradicate the drug problem in and around the tavern property[;]" that "she had called the police 75 to 100 times with complaints relative to narcotics[;] that she had a policy of refusing to serve and ejecting persons under the influence of drugs[;] and that she instructed her bartenders to do the same." *Ishmal, supra,* 58 *N.J.* at 350–51, 277 *A.*2d 532. In determining Mrs. Ishmal's liability, we concluded that "her conduct convincingly demonstrates that she did not permit, allow or

---

state of mind required for the imposition of vicarious liability on liquor licensees remains unaffected.

suffer rule violations to occur in any manner." *Id.* at 350, 277 *A.*2d 532.

In two very basic and independently dispositive respects, this case differs from *Ishmal.* First, the illegal activity in *Ishmal* was performed by patrons but was actively discouraged by the licensee and her employees, whereas the illegal activity here was performed by one of respondent's employees, albeit surreptitiously. That factual difference does not allow respondent to claim—as Mrs. Ishmal could—that it did not allow, permit or suffer the unlawful behavior. Second, *N.J.A.C.* 13:2–23.28(c)—the regulatory provision which imposes strict vicarious liability on a licensee for the unlawful actions of its agents, servants, and employees— was not addressed in *Ishmal.* *Ishmal* only considered those regulatory provisions that prohibited a licensee from " 'allow[ing], permit[ting] or suffer[ing] in or upon the licensed premises . . . any unlawful possession of or any unlawful activity pertaining to narcotic drugs[, or] any . . . immoral activity[, or conducting] the licensed place of business . . . in such manner as to become a nuisance.' " *Ishmal, supra,* 58 *N.J.* at 349, 277 *A.*2d 532 (quoting rules 4 and 5 of State Liquor Regulation 20). For that reason, *Ishmal* speaks in terms of direct liability when it explains that "[r]ules 4 and 5 of State Regulation 20 promulgated by the Director impose on the licensee the responsibility, at the peril of its license, for precluding offensive and unlawful conduct in its establishment[,]" *id.* at 351. *Ishmal* does not address a licensee's vicarious liability for the acts of others.

As a matter of law, acts by a liquor licensee's employees are no different than those of the licensee itself. Thus, even despite the many prophylactic measures respondent adopted, the legal conclusion remains that, because respondent is vicariously liable for the on-premises unlawful acts of its employees concerning illicit drugs, it has "allowed, permitted or suffered" those acts.

B.

That said, whether, under the circumstances presented, the penalty imposed should be mitigated remains to be addressed.

Closely paralleling its argument in respect of liability, respondent urges that its extensive efforts to prevent illegal activities at its licensed premises coupled with its long history of charitable and civic-minded activities should mitigate the penalty to be imposed. To the extent those efforts and patterns speak to the quantum of the penalty to be imposed, we agree.

After having had the opportunity to observe all of the witnesses and to gauge their credibility, the ALJ found several mitigating factors and no aggravating factors. As a result, and starting from a presumptive penalty of a 540–day suspension, the ALJ recommended that respondent's license be suspended for a period of sixty days, or slightly more than one-tenth of the presumptive penalty. In a separate plea for lenity, the ALJ also "urged" that the Director allow a monetary compromise in lieu of suspension. The Director rejected the ALJ's penalty recommendation and, instead, imposed a 370–day license suspension, 240 days of which were stayed, thereby resulting in a 130–day suspension. That penalty is excessive and cannot stand.

We are mindful that "[o]ur appellate review of an agency's choice of sanction is limited. Courts generally afford substantial deference to the actions of administrative agencies such as the Board ... because of the expertise and superior knowledge of agencies in their specialized fields, and because agencies are executive actors[.]" *In re License Issued to Zahl,* 186 *N.J.* 341, 353, 895 *A.*2d 437 (2006) (citations and internal quotation marks omitted). We have explained that "the Court will modify a sanction 'only when necessary to bring the agency's action into conformity with its delegated authority.' " *Id.* at 353–54, 895 *A.*2d 437 (quoting *In re Polk License Revocation,* 90 *N.J.* 550, 578, 449 *A.*2d 7 (1982)). This is so because " '[t]he Court has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency. It can interpose its views only where it is satisfied that the agency has mistakenly exercised its discretion or misperceived its own statutory authority.' " *Id.* at 354, 895 *A.*2d 437 (quoting *Polk, supra,* 90 *N.J.* at 578, 449 *A.*2d 7).

Distilled to its essence, then, "the test in reviewing administrative sanctions is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." *Ibid.* (internal quotation marks omitted).

Applying those standards, we conclude that the Director's rejection of the ALJ's findings in respect of mitigation constituted a mistaken exercise of discretion. In short, the punishment meted out to respondent, in light of all of the facts and circumstances presented to the ALJ, is "shocking to one's sense of fairness."

The ALJ found, and the Director accepted, that respondent "engaged in extraordinary efforts to detect and eradicate illegal activities of any kind on its premises" [13] and that respondent and the Troianos "have held liquor licenses since 1954 and these are their first violations[.]" The Director rejected, however, the ALJ's findings that "[t]he six violations of *N.J.A.C.* 13:2–23.5(b) 'were committed by Mr. Barone in a careful and secretive manner, and these violations were virtually undetectable;' " that "[t]here was no evidence of the involvement of the Troianos in Mr. Barone's activities;" that respondent's and the Troianos' "characters are such that the occurrence of another offense is unlikely;" and that " 'the imposition of a lengthy period of suspension would entail excessive hardship to respondent and his employees and their dependents.' "

We cannot sustain the Director's rejection of the ALJ's reasoned and well-supported findings. The Director's rejection of the ALJ's finding concerning the secretiveness of Barone's actions

---

[13] When asked, during oral argument, what additional efforts this respondent could have expended to avoid liability or to mitigate any resulting penalty, the State ABC's sole proposal was that respondent employ attendants to monitor behavior in its bathrooms. Yet, neither the Alcoholic Beverage Control Act nor its regulations mandate the maintenance of a surveillance system—much less live attendants monitoring behavior—as a condition of the issuance, maintenance or renewal of an alcoholic beverage license. In the circumstances presented in this case, that proposal is rejected as both unreasonable and impractical.

conflates whether knowledge of illegality is relevant to liability with whether that knowledge is relevant to punishment. Exclusively on the issue of whether liability is to be imposed, the doctrine of strict liability renders irrelevant whether the licensee had knowledge of unlawful acts on the licensed premises. In contrast, a licensee's knowledge is certainly relevant to the quantum of penalty to be imposed. Our system of retributive justice is founded on the concept that intentional acts are penalized more severely than, for example, reckless or negligent ones. To ignore, in measuring the proper penalty to be imposed, the state of mind of a licensee in allowing, permitting, or suffering an illicit act to occur on his licensed premises is not in keeping with the proportionate imposition of penalties.

We also cannot accept the Director's rejection of the ALJ's finding in mitigation that these violations were respondent's first brush with the regulatory system. In the Director's view, "involvement of a licensee in a single drug violation carries the heavier presumptive penalty of revocation" and, therefore, "the fact that the Troianos were not involved in the subject violations cannot be used to mitigate the lesser penalty of 90 days per violation when the drug violation involves an employee." It is unquestioned that had the Troianos themselves been involved in any drug sales on the licensed premises, revocation would have been among the permitted penalties. *See N.J.A.C.* 13:2–19.11 (adopting penalty schedule providing for license revocation in event of narcotic activity on licensed premises involving licensee). However, it remains beyond dispute that the Troianos were not involved in Barone's activities and that they undertook every conceivable effort to avoid that behavior on the licensed premises. As the ALJ perceptively noted, if a licensee's efforts geared towards compliance ultimately are to be given no weight, there simply is no incentive to perform above the bare minimum required. That result, clearly, cannot be a proper law enforcement goal.

■ The Director also dismissed the ALJ's reliance on respondent's and the Troianos' good character as indicative of whether the occurrence of another similar event was likely. He concluded, without explanation, that "the good character and reputation of [a] licensee cannot be used to predict whether there will be another offense in the future." Yet, good character and reputation are relevant in penalty considerations.[14] Finally, the Director rejected the ALJ's consideration of the hardship to be imposed because, in the Director's view, "hardship is a component of any suspension." Although one cannot disagree with that basic proposition, it cannot be expanded as far as the Director wishes. Any suspension—of whatever length—carries an element of hardship. Indeed, it is acknowledged that the "[v]iolation of an operational regulation requires punishing the licensee even though the punishment may hurt innocent people[.]" *Country Hearth, Inc., supra,* 221 *N.J.Super.* at 297, 534 *A.*2d 424. However, in determining the penalty to be imposed, excessive hardship on respondent and those who rely on respondent is a proper subject for consideration.[15]

■ In the end, the penalty to be imposed must be proportional to the relevant facts. Here, an employee—without his employer's knowledge or consent, against his employer's instructions, and defeating the protective measures the employer implemented—engaged in six illicit drug transactions with an undercover law enforcement officer. Those multiple transactions were the result of repeated purchases by government agents when, as Carmack admitted at the penalty hearing, law enforcement had all of the

---

[14] For example, in a different context, the Legislature has mandated that "[i]n determining the appropriate sentence to be imposed ... the court may properly consider ... [that t]he character and attitude of the defendant indicate that he is unlikely to commit another offense[.]" *N.J.S.A.* 2C:44–1(b)(9).

[15] Again in a different context, the Legislature has provided that in determining the appropriate criminal sentence to be imposed, a court may consider whether the sentence would entail excessive hardship to the criminal defendant or his or her dependents. *N.J.S.A.* 2C:44–1(b)(11).

information it needed to determine that Foglio was Barone's supplier after the very first drug purchase and provided no rationale for the repeated drug purchases. We recognize that, under the State ABC's own regulations, narcotics activity on the licensed premises involving an employee carries a ninety-day suspension for the first violation and a license revocation for the second violation. *N.J.A.C.* 13:2–19.11. Those same regulations require that, before a second or subsequent violation can be used to enhance a penalty, the licensee must be on notice of the prior violation. *N.J.A.C.* 13:2–19.11(g).[16] Nothing in this regulatory structure permits the State ABC—without a legitimate investigative purpose—to merely pile violation upon violation solely to disproportionately enhance the punishment to be meted out to a licensee.

■ For that reason, under these circumstances, an analysis that allows the State ABC to aggregate violations solely to enhance the level of punishment cannot be sustained. In this unique context, the proper analysis must be guided by the long-held principle that if two offenses are committed at different times but result in the imposition of liability at the same time, neither is deemed to be a prior adjudication for penalty purposes.[17] The

---

[16] *N.J.A.C.* 13:2–19.11(g) also provides that "if violations are discovered during an undercover operation, then no notice of any prior violation is necessary to impose the penalty for a second, third or fourth violation." However, as our analysis explains, the fact that Carmack was engaged in an undercover operation does not, in and of itself, justify the imposition of enhanced penalties. Something more than the mere repetition of acts is required to overcome the regulation's presumption that notice of prior violations is a condition precedent to the imposition of enhanced penalties.

[17] By way of analogy to the criminal law context, it is clear that "an offense cannot be characterized as a second or subsequent offense unless at the time it was committed the defendant had already, *i.e.,* previously, been convicted [because] simultaneous convictions are both technically and philosophically not fairly regardable as chronologically sequential convictions." *State v. Anderson,* 186 *N.J.Super.* 174, 176, 451 A.2d 1326 (App.Div.1982), *aff'd o.b.,* 93 *N.J.* 14, 459 A.2d 302 (1983); *see also* Cannel, *N.J. Criminal Code Annotated,* comment 3 on *N.J.S.A.* 2C:44–4.

circumstances presented by this case compel the conclusion that the six violations of *N.J.A.C.* 13:2–23.5(b) charged against respondent must, for purposes of imposing a penalty, be considered as only one violation, placing the maximum period of suspension at ninety days.

Although that conclusion places the outer limit of respondent's possible suspension at ninety days, it does not end the inquiry. There were no aggravating circumstances found. As a result, the Director must nevertheless determine whether the mitigating circumstances identified by the ALJ and embraced here permit a decrease in the penalty to be imposed. *See N.J.A.C.* 13:2–19.13(a). In doing so, the Director may rely on the non-exclusive list of mitigating factors listed in the regulations. *N.J.A.C.* 13:2–19.13(b). In addition, the Director should consider all of the mitigating factors found by the ALJ. Finally, we trust both the Director and respondent will revisit the ALJ's final recommendation: that respondent propose to the Director, and that the Director fairly consider, a fair and reasonable monetary compromise in lieu of a suspension. We commend all of those considerations to the exercise of the Director's reasoned discretion on remand. We do so in the expectation that, at the remand, the State ABC will continue to honor its "reputation for acting reasonably because it conducts itself sensibly in carrying out its regulatory mission while at the same time being cognizant of the needs of the industry which it regulates." Kevin Marc Schatz, *A Practitioner's Guide to ABC Disciplinary Review,* 137 *N.J.L.J.* 1658, 1672 (Aug. 15, 1994). Neither the State ABC, nor its licensees, nor the public both serve are entitled to anything less.

## IV.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the cause is remanded to the Director of the Division of Alcoholic Beverage Control of the Department of Law and Public Safety for further proceedings consistent with the principles to which we have adverted.

*For affirmance in part; reversal in part/remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.